The State of Ohio, Appellee, *v.* Johnson, Appellant.

(No. 41961—Decided October 23, 1980.)

*Mr. John T. Corrigan,* prosecuting attorney, for appellee.
*Mr. Terry H. Gilbert,* for appellant.

Day, J.   This case is an appeal from a jury verdict in the Court of Common Pleas of Cuyahoga County.

Defendant-appellant, William Johnson (defendant), and three others were indicted on 12 counts each resulting from a robbery in North Royalton in January 1979. Defendant and one other codefendant, Charles Roberts, were tried together and were represented jointly by the same lawyer. After the trial court directed out one count of attempted rape against each man, a jury found both Johnson and Roberts guilty of the eleven remaining charges: one count of aggravated burglary, R. C. 2911.11; five counts of aggravated robbery, R. C. 2911.01; and five counts of kidnapping, R. C. 2905.01. Defendant was sentenced to serve from seven to twenty-five years on each count, sentences to run concurrently.

From his convictions defendant appeals. For reasons adduced below the judgment is reversed and the defendant discharged.

## I.

The undisputed facts in the crime are that at least three men broke into the Ragone home in North Royalton in the early morning hours of January 9. John and Mary Ragone and their three daughters were asleep. After awakening the family, herding them into the parents' bedroom and subsequently binding them with lamp and telephone cords cut in the home, the intruders ransacked the house looking for money. They escaped in the family car with some money, clothing, jewelry, television sets, and other goods.

One man, wearing a nylon stocking mask and armed with a gun, turned on the light in the master bedroom and roused Mr. and Mrs. Ragone. Before the couple was ordered to lie face down on the floor, Mr and Mrs. Ragone got a good look at the man. The bedroom clock said 2:20.

Another man herded two of the Ragones' three daughters, Diane, then 17, and Joanne, 7, into their parents' room. Toni, then 14, was grabbed by a third, smaller man. Before the events of the night were over, all five members of the family were lying face down on the floor with their ankles bound together and their wrists tied behind their backs with telephone and lamp cords. They were not permitted to look up and had no opportunity to recognize any of the other intruders.

The third intruder armed with a gun and a screwdriver grabbed 14-year-old Toni by her hair and dragged her downstairs to help him find more money. At one point this man dragged Toni into the basement and threatened to rape her if she did not find additional money. He kept pounding at her head with the screwdriver and punching her in the face bloodying her nose. Toni "kneed him" in his groin and ran screaming upstairs where she encountered another intruder. She told him about the attempted rape but this man, described as "a big man * * * over six foot, over 200 pounds", told Toni not to worry because, "We are not here for sex; we are here for money".

At one point Mrs. Ragone was struck on the arm with a black handgun causing a bruise. And when John Ragone tried

to look up at one intruder armed with a rifle, the robber used it to hit Ragone at the back of the head creating a painful bump. One of the men threatened to rape the seven-year-old.

A fourth man, Gary Shaniuk, was indicted along with Johnson, Roberts, and Jerry Bak. Shaniuk testified for the state pursuant to a plea bargain arrangement. Shaniuk claimed he remained on the first floor of the home looking for money and did not get beyond the top of the stairs to the second floor, although he heard Johnson tell Toni "he ain't going to rape you, we just came here for money". He testified that he pulled a lamp cord which was to be used to bind the family members.

Although the intruders were looking for "thousands", they found considerably less. They took $600 from a kitchen cabinet, an unspecified amount from a bedroom closet representing receipts from John and Mary Ragone's restaurant from the previous evening, and silver coins hidden in a bedroom couch. In their search for money the intruders created a shambles in the home. Every room was torn apart; every drawer was emptied; pictures were removed from the wall; and clothing and other things were strewn around the house and on the stairs.

The intruders, who had arrived in a car stolen from a west side Cleveland used car lot with plates stolen from a car in a west side driveway, loaded the car with goods taken from the Ragone home including clothing, television and radio sets, a typewriter, silverware, a stereo and liquor. But the stolen car got stuck in a snowdrift in the driveway so the burglars took a smaller car belonging to the Ragone family. The small car could not hold all the loot so some of it was left on the ground outside the house.

After the family members got untied, John Ragone, wearing his wife's coat because he could not find his clothes in the mess, called police from a neighbor's home. Police came and took photographs (which were later lost and not introduced as evidence) and made fingerprint lifts at the home and in the abandoned car. When the Ragone car was recovered some ten days later, the police also took lifts from that car. No prints were found that belonged to any of the suspects.

Several months later Shaniuk was arrested on an unrelated charge. He was angry and "had lived for the honor of the

criminal code long enough to be betrayed, and it wasn't working for me so I decided to make statements". Shaniuk confessed to the Ragone burglary and implicated Jerry Bak, Roberts, and Johnson. Testimony showed, however, that Shaniuk, who faced approximately two dozen charges resulting from four incidents, had cut a deal with the prosecutor's office. Under it he would face only two probationable charges. There was a variety in the cases to be dropped, including a drug charge. Thus, several felony counts against Shaniuk would not be prosecuted and he would plead to two probationary offenses, burglary and robbery.

On the basis of Shaniuk's statement search warrants were issued for the homes of the three other defendants. Mrs. Ragone's leather coat was recovered from Roberts' home; weapons similar to those used in the robbery-kidnapping were recovered from Bak's house. Nothing "of merit in this case" was found at Johnson's home.

Mrs. Ragone identified Roberts as the intruder who held the family captive with the gun from a photo array presented at the North Royalton Police Station. She also identified Roberts in court. Although Mr. Ragone did not select Roberts' picture from the photo array, he, too, identified Roberts at trial.

Neither Diane nor Toni, the two older daughters who testified, identified either Johnson or Roberts.

The various family members, however, did describe the second man upstairs as: "a tall * * * husky * * * guy" wearing light brown boots; "tall man with a rifle in his hand"; "about six foot * * * husky" with blonde hair; "over six foot tall, over 200 pounds, he had light brown hair * * * sticking out"[1]; "a big guy, very big guy * * * big shoulders * * * big man".

The only specific identification of Johnson as a participant in the incident was by codefendant Shaniuk.

The prosecution introduced no evidence of a voice comparison of Johnson although he was accused of saying either, "We are not here for sex; we are here for money", or "Don't

---

[1] Note also that Mrs. Ragone described the man she identified as Roberts as having a "long hairdo" and having "long hair which * * * was coming out of the pantyhose".

worry about that; he ain't going to rape you; we just came here for money".

Johnson, who testified in his own behalf, admitted that he was six foot three and probably weighed about 190 pounds when the incident occurred. The record does not reflect his hair color. He denied any participation or complicity in the crime.

Shaniuk did not explain how he knew Johnson, but Johnson testified that he lived with his brother and sister-in-law in an upstairs suite in a two-family home on Scranton (or Grayton) Road. Shaniuk's parents lived in the downstairs suite. On one occasion shortly after Shaniuk got out of prison, Johnson said that Shaniuk was invited upstairs with Johnson, his sister-in-law and brother. The brother went out. After the brother left, Shaniuk tried to follow Johnson's sister-in-law into the bathroom. An angry Johnson then threatened to throw Shaniuk out of the window. Shaniuk denied that the incident occurred.

Although Johnson claimed he had not met Roberts before they were indicted, he had seen Roberts jogging on the street. Johnson was acquainted with Bak and had sold him his car.

A fifth man, identified as Dave Pesos, figured in events on the day preceding the Ragone incident but was not among those implicated by Shaniuk.

Pesos and his girlfriend lived in an apartment rented to Shaniuk and was a frequent visitor to Roberts' house. Pesos was described as Roberts' brother-in-law although Roberts no longer lived with Pesos' sister.

Shaniuk had met Pesos at the Mansfield Reformatory when both were inmates and met Roberts through Pesos. Roberts' current girlfriend met Pesos through Shaniuk and Johnson had been acquainted with Pesos through school and because a friend of Johnson's was allegedly robbed by Pesos.

Shaniuk admitted that Pesos, a friend whom he had seen the day of January 8, was six-foot four. Johnson said Pesos was "as big as I am".

Johnson assigns three errors:

"I. The trial court erred in overruling appellant's motion for acquittal in that appellant's conviction was based solely upon the uncorroborated testimony of an accomplice in violation of Ohio Revised Code 2923.03(D).

"II. The trial court erred by its failure to conduct a pre-

trial hearing as to the propriety of joint representation in order to insure the appellant's right to effective assistance of counsel under the Sixth Amendment to the United States Constitution.

"III. The appellant was denied effective assistance of counsel as required by the Sixth Amendment to the United States Constitution because the joint representation of counsel created a conflict of interest."

## II.

It is well established that the mere testimony of an accomplice is insufficient to implicate a suspect. " * * * His testimony must be corroborated by *some other fact, circumstance, or testimony which also points to the identity of the one he accuses as a guilty actor* * * * " (emphasis added and footnote omitted), *State* v. *Myers* (1978), 53 Ohio St. 2d 74, 75. The *Myers* court held that R. C. 2923.03(D)[2] means that a conviction cannot be based upon the uncorroborated testimony of an accomplice. The court warned that such a requirement is essential " * * * [i]n this day of plea bargaining and immunized testimony * * * ", *Myers, supra,* at 75.

This position was reaffirmed earlier this year in *State* v. *Pearson* (1980), 62 Ohio St. 2d 291.

In *Pearson*, it was said:

" * * * At best * * * corroboration of an accomplice's testimony concerning the material circumstances of a crime, apart from the accused's connection therewith, demonstrates that the *accomplice* was connected with the crime. It does little to allay one's concern that the accomplice is being untruthful concerning the accused's connection with the crime, * * *.

" * * * [I]n order for the prosecution to satisfy the corroboration requirement of R. C. 2923.03(D), independent evidence must support an accomplice's testimony, and must tend to connect the accused with the alleged crime or must tend to identify the accused as a guilty actor." (Emphasis *sic* and footnotes omitted.)[3]

In the instant case the only independent evidence

---

[2] R. C. 2923.03(D) provides:

"No person shall be convicted of complicity under this section solely upon the testimony of an accomplice, unsupported by other evidence."

[3] *State* v. *Pearson, supra,* at 294-95.

"tend[ing] to connect the accused" with the crime or "tend[ing] to identify the accused as a guilty actor" are the descriptions by the Ragone family members of a "tall", "husky guy" who is either "about six foot" or "over six foot tall" with either light brown or blonde hair. Conceivably such a description could fit hundreds of men and, possibly, another man, Dave Pesos, who is a friend or at least an acquaintance of all the men involved.

The first assignment of error is well taken.

### III.

Standards, Relating to the Function of the Trial Judge, developed by the American Bar Association, which do not have the force of law, urge the trial judge to " * * * inquire into potential conflicts which may jeopardize the right of each defendant to the fidelity of his counsel" whenever two or more defendants are represented by the same lawyer.[4]

Trial court inquiry into potential conflicts in joint representation is urged, *inter alia,* in the First Circuit, see, *e.g., United States* v. *Foster* (C.A. 1, 1972), 469 F. 2d 1[5]; Second Circuit, see, *e.g., United States* v. *Carrigan* (C.A. 2, 1976), 543 F. 2d 1053, 1055-1056; and, the Third Circuit, see, *e.g., United States* v. *Rad-O-Lite of Philadelphia, Inc.* (C.A. 3, 1979), 612 F. 2d 740.[6]

In the First and Second Circuits no rigid rule is established. However, absent an inquiry concerning a knowing waiver on the record (there was none in the instant case), the burden is on the government.[7]

---

[4] ABA Standards Relating to the Function of the Trial Judge (1972), Section 3.4(b), at page 44. The comment accompanying the standard further suggests that " * * * [a] waiver of the right to separate representation should not be accepted by the court unless the defendants have each been fully informed of the probable hazards; and the voluntary character of their waiver is apparent. * * * " *Id.,* at 45.

[5] " * * * [I]t shall be the duty of the trial court, as early in the litigation as practicable, to comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney, and whether they understand that they may retain separate counsel, * * * ." *United States* v. *Foster, supra,* at 5.

[6] " * * * The district court bears a substantial responsibility for ensuring that conflicts of interests resulting from joint representation do not deprive the accused of a fair trial * * * ", *United States* v. *Rad-O-Lite of Philadelphia, Inc., supra,* at 744.

[7] *United States* v. *Foster, supra,* at 5; *United States* v. *Carrigan, supra,* at 1056.

The Fifth Circuit has said that "[t]he trial judge has an obligation * * * to anticipate conflicts reasonably foreseeable at the outset of the case, when counsel is appointed * * * ".[8] But the trial court need not " * * * warn codefendants of the disadvantages, including possible conflicts of interest, of joint representation. * * * "[9]

No case has been found holding that joint representation is unconstitutional per se. Indeed, the United States Supreme Court has long held and recently reaffirmed that:

" * * * Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel. This principle recognizes that in some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation. In Mr. Justice Frankfurter's view: 'Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack.' *Glasser* v. *United States, supra,* at 92 (dissenting opinion)." (Footnote omitted.)[10]

And the Court of Appeals for New York has said:

" * * * [T]here exists no compelling reason to adopt a rule which would automatically equate the trial court's failure to undertake proper precautionary measures with an error of constitutional magnitude requiring reversal in every instance. * * * "[11]

Nevertheless, trial judges in the New York state courts are given the responsibility for determining on the record whether each defendant represented by the same counsel is aware of potential risks:

" * * * While a defendant may choose to retain his attorney, such choice may be made only after the defendant is informed of the possible ramifications which joint representation might spawn when conflicting interests arguably exist. Only after sufficient admonition by the trial court of the potential pitfalls of joint representation can it be said that a defendant's right to the effective assistance of counsel is adequately

---

[8] *Foxworth* v. *Wainwright* (C.A. 5, 1975), 516 F. 2d 1072, 1076.

[9] *Id.,* fn. 5, at 1076.

[10] *Holloway* v. *Arkansas* (1978), 435 U. S. 475, 482-483.

[11] *People* v. *Macerola* (1979), 47 N.Y. 2d 257, 264, 417 N.Y. Supp. 2d 908, 911.

safeguarded. If such admonition does appear on the record, appellate courts are able to determine whether a defendant's decision to retain his attorney is indeed an informed choice." (Footnote omitted.)[12]

A rule that requires that the trial court inquire into whether joint representation is knowingly accepted is a salutary one. It safeguards the important constitutional right to the effective assistance of counsel and at the same time effects a step which assures the elimination of a potential source of error. Moreover, this is accomplished with relatively small additional effort by the trial judge. Accordingly, the rule is approved and adopted.

In the future, when joint representation is a factor, the trial court will inform the defendant of the possible conflict-of-interest ramifications generated by joint representation and secure his voluntary agreement to the representation. All of these procedures are to be made a matter of record.

The second assignment of error is well taken.

## IV.

Effective assistance of counsel is part of the promise of the Sixth Amendment to the United States Constitution established by a long line of cases. Nearly forty years ago in *Glasser* v. *United States* (1942), 315 U. S. 60, the Supreme Court remanded a case because it found ineffective assistance when Glasser's retained attorney was appointed to represent a codefendant in the same case who had differing interests from Glasser. The court warned:

" * * * The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial. * * * "[13]

Glasser's conviction was reversed because of " * * * the weakness of the Government's evidence against him; with guilt a close question, 'error, which under some circumstances *would not be ground for reversal,* cannot be brushed aside as immaterial, since there is a real chance that it might have provided the slight impetus which swung the scales toward guilt.' * * * " (Emphasis *sic.*)[14]

---

[12] *People* v. *Macerola, supra,* 47 N.Y. 2d, at 263, 417 N.Y. Supp. 2d, at 911.

[13] *Glasser* v. *United States, supra,* at 76.

[14] *Holloway* v. *Arkansas, supra,* at 488.

In order to determine ineffective representation, the Ohio Supreme Court has spelled out a "two-step process". In *State v. Lytle* (1976), 48 Ohio St. 2d 391, 396-397, vacated on other grounds (1978), 438 U. S. 910, it was said:

" * * * First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness.

"On the issue of counsel's effectiveness, the appellant has the burden of proof, since in Ohio a properly licensed attorney is presumably competent. * * * "

The record shows that trial counsel argued the uncorroborated-accomplice point on defendant's behalf. This was a principal point of defense.

There appears no other record reference to support prejudice to the defendant (cf. App. R. 12[A] ). However, it is quite apparent that the dramatically contrasting situations of the clients posed an unavoidable conflict for the lawyer. When counsel cannot argue for one client without damage to the co-client by even implicit comparison (the case here), damage to effective representation is ineluctable and prejudice will be presumed.

The third assignment of error is well taken.

*Judgment reversed and defendant discharged.*

KRENZLER, C. J., and STILLMAN, J., concur.